Sandra G. MOORE, Plaintiff,

v.

The CHESAPEAKE AND OHIO RAIL-
WAY COMPANY, a corporation, De-
fendant and Third-Party Plaintiff,

v.

ROLLYSON'S CATERING SERVICE,
INC., a corporation, Third-Party
Defendant.

Civ. A. No. 77–3056.

United States District Court,
S. D. West Virginia,
Huntington Division.

July 15, 1980.

Donald L. Rudquist, Minneapolis, Minn., Lawrence J. Lewis, Huntington, W. Va., for plaintiff.

Fred Adkins, Huntington, W. Va., for defendant and third-party plaintiff.

Norman K. Fenstermaker, Huntington, W. Va., for third-party defendant.

## MEMORANDUM OPINION

STAKER, District Judge.

Plaintiff, Sandra G. Moore, filed her complaint against defendant, The Chesapeake and Ohio Railroad Company (C&O), under Title 45 U.S.C. § 51, et seq. (FELA), alleging that on January 19, 1977, while she was a C&O employee and was acting in furtherance of C&O's business of interstate commerce and transportation, she was injured as the result of the negligence of C&O in failing to provide her with a safe place to work and failing to adopt safe customs and practices and "other acts of negligence," all of which C&O and Rollyson, the third-party defendant hereafter named, denied in their answers to the complaint, except C&O admitted that plaintiff was in its employ at the time of the alleged injuries.

C&O in turn filed its third-party complaint against Rollyson's Catering Service, Inc. (Rollyson), and attached thereto, as "Exhibit C," an agreement between C&O and Rollyson dated August 20, 1974 (Agreement), and therein alleged that plaintiff's complaint alleged a claim against C&O for injuries sustained by her while she was preparing to have lunch in a cafeteria operated by Rollyson under that Agreement at which time Rollyson was in exclusive control thereof; that such injuries were caused solely by Rollyson's negligence; that pursuant to paragraph 17 of the Agreement, C&O gave Rollyson written notice of plaintiff's action herein against C&O and tendered defense thereof to Rollyson (the receipt of that notice having been admitted by Rollyson in its answer to the third-party complaint); that under the terms of paragraph 16 of the Agreement Rollyson agreed to indemnify C&O from any liability, claim, etc., for injury to persons arising out of or incident to the use of the cafeteria; and that if C&O should be compelled to pay damages to plaintiff herein, then under the terms of the Agreement C&O was entitled to recover over against Rollyson the amount thereof as well as C&O's expenses in defending the same, including reasonable attorney fees.

In its answer to the third-party complaint, Rollyson substantially denied the allegations thereof, except for admitting the receipt of the aforesaid notice from C&O, and asserted therein that the indemnification provisions of the Agreement did not apply to require Rollyson to indemnify C&O for any damages recovered by plaintiff against C&O.

Trial of the action had in this court March 10–13, 1980, resulted in a jury verdict in plaintiff's favor and against C&O for $150,000. In addition to that verdict, the jury rendered answers in writing to certain written questions propounded to it by the court, more about which below.

Following trial, each of C&O and Rollyson filed their separate motions for judgment notwithstanding the verdict, or in the alternative, for a new trial, and C&O also filed its motion for judgment against Rollyson.

It is the issues raised by these three motions which are addressed and disposed of herein.

### The Evidence

A brief resume of pertinent portions of the evidence presented at the trial is essential to a discussion and treatment of the motions:

The evidence showed that on the date of her injuries, plaintiff was employed by C&O in a clerical position at an office in C&O's office building in Huntington, West Virginia, which also housed the cafeteria then being operated by Rollyson pursuant to the Agreement; that during her lunch hour on that date plaintiff went to the cafeteria to have her lunch, and while there stepped on a "pat" of butter on the cafeteria floor and slid and injured her back; that C&O did not require plaintiff nor any of its employees to have lunch at that cafeteria, and they pa-

tronized it at their option, plaintiff often having her lunch at various restaurants located off C&O's premises, though patronizing the cafeteria and thereby avoiding leaving the building to eat was, particularly in inclement weather, convenient for plaintiff and other of C&O's employees who worked in the building and the vicinity thereof; and that the cafeteria was intended to, and the Agreement provided that it would, admit and serve only C&O's employees and their guests, though on very infrequent occasions persons who were not C&O's employees nor their guest may have visited C&O's office building on business and patronized the cafeteria.

The evidence bearing upon the relationship between C&O and Rollyson was not conflicting. In the main it consisted of the written Agreement, which both Rollyson and C&O agreed contained the terms of their contract, obligations, etc., and testimony relating to the manner of Rollyson's performance thereunder.

### Rollyson's and C&O's Motions for Judgment Notwithstanding the Verdict, and in the Alternative, for a New Trial

Various grounds and points of error are assigned in support of these two motions, many of which are common to each. For the reasons following, each of the motions is overruled:

Both prior to and during trial, Rollyson and C&O have conceded that the provisions of 45 U.S.C. § 51 create liability on the part of a carrier such as C&O for injury to its employee caused by the negligence of such carrier's "agent," but have contended, and reiterate in their motions, in substance, that as a matter of law, in Rollyson's operation of the cafeteria under the Agreement with C&O, Rollyson was acting as an independent contractor of C&O, was performing a non-operational or non-regular function or activity for C&O, and was not acting as C&O's agent, by reason of which Rollyson's negligence, if any, was not imputable to C&O under the so called "operational activity" doctrine enunciated in *Sinkler v. Missouri Pacific R. Co.*, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958), and its progeny and related cases.

In *Sinkler*, the petitioner brought action under FELA for injuries sustained while employed as a cook on the private car furnished by respondent railroad to its general manager when that car struck another while being switched by the Belt Railway, a carrier theretofore organized by respondent's predecessor and other railroads to perform their switching operations under contract at a terminal used by all of them. Respondent contended that the Belt Railway was an independent contractor, was not its agent, and that the provisions of 45 U.S.C. § 51 thus did not apply to subject respondent to liability. The Court held the Belt Railway to be a constructive agent of the respondent railroad notwithstanding its independent contractor status. In so doing, it pointed out the broad purpose of FELA to be the promotion of the welfare of both employer and employee, by adjusting the losses and injuries inseparable from industry and commerce to the strength of those who in the nature of the case ought to share the burden; that an accommodating scope must be given to the word "agents" to give vitality to the standard governing the liability of carriers to their workers injured on the job; that it was manifest that the Belt Railway's freedom from detailed supervision of its operations by respondent was irrelevant inasmuch as the switching crew of the Belt Railway at the moment of the collision in the station was engaged in *furthering the operational activities* of respondent; and laid down the rule that when a railroad employee's injury is caused in whole or in part by the fault of others *performing*, under contract, *operational activities* of his employer, such others are "agents" of the employer within the meaning of 45 U.S.C. § 51.

The Court in *Sinkler* thus spoke not only of "performing operational activities" but also of "furthering operational activities" by one, under contract, for a railroad.

In *Smith v. Norfolk & Western Ry. Co.*, 407 F.2d 501 (4th Cir. 1969), the court recognized that *Sinkler* merely engrafted upon the law of agency the "operational activity" doctrine, which is uniquely applicable to FELA actions, and as a matter of law oper-

ates such that one who performs, under contract with a carrier, an operational activity of that carrier becomes the carrier's constructive agent, and thus its agent within the provisions of 45 U.S.C. § 51, regardless of whether such one is or is not, as a matter of fact and law, an independent contractor as to that carrier; but that in thus engrafting the same thereon, the court in *Sinkler* left otherwise undisturbed and viable the traditional agency tests which remain alternatively and equally as applicable to the facts of FELA actions for the purpose of determining whether one performing activities for a carrier is an actual, as distinct from a constructive, agent of such carrier within the provisions of FELA.[1]

Thus, (1) if Rollyson was performing or furthering an operational activity for C&O by operating the cafeteria under the terms of the Agreement, then under the "operational activity" doctrine of *Sinkler* Rollyson was the constructive agent of C&O in so doing and Rollyson's negligence was imputable to C&O notwithstanding that Rollyson also may have been an independent contractor as to C&O under the Agreement in so doing, and (2) if Rollyson was not performing or furthering an operational activity for C&O in so doing, then (a) if Rollyson was an independent contractor of C&O under the law and the facts, Rollyson's negligence was not imputable to C&O, but (b) conversely, if Rollyson was an actual agent of C&O, as determined by the traditional agency tests applicable, then Rollyson's negligence was imputable to C&O.

Two issues are thus presented: First, did the operation of the cafeteria by Rollyson under the Agreement constitute the performance or the furtherance by it of an operational or regular activity or function

of C&O? Second, if not, then did Rollyson act as an independent contractor, on the one hand, or an agent, on the other, of C&O in operating the cafeteria thereunder?

Each of these issues is decided below notwithstanding that the decision reached as to the first obviates the necessity of deciding the second.

*Addressing this first issue:* So far as this court's research has disclosed, the term "operational activity" has never been defined in any reported case, nor has any court enunciated any test by which a given activity of a railroad may or may not be determined to be an operational one. *See* 29A Words and Phrases, "Operational activity," 460 (perm. ed. 1972). Understandably the determination of whether a given activity of a carrier is an operational activity must be made upon a case-to-case basis.

In *Ward v. Atlantic Coast Line R. Co.,* 362 U.S. 396, 397, 80 S.Ct. 789, 791, 4 L.Ed.2d 820 (1960), in distinguishing its facts from those of *Sinkler,* the court said: "This was not a situation, as in *Sinkler,* in which the railroad engaged an independent contractor to perform *operational activities required to carry out the franchise*" (emphasis added), which furnishes one parameter to the meaning of "operational activity," as used in *Sinkler.*[2]

65 Am.Jur.2d, Railroads, § 7, reads in part:

Thus, the franchises of a railroad are rights or privileges essential to its operation and without which its works and road would be of little value; they are positive rights and privileges without which the railroad could not be *successfully* worked. (emphasis added)

---

1. It is to be noted that in *Smith* the issue was whether, under FELA, the plaintiff, an employee of a contractor of the defendant railroad, was an employee of the defendant in virtue of the relationship that existed between the defendant and the contractor. See also: *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974) involving that same issue. That issue is not presented in the case at bar.

2. *But see Leek v. Baltimore & Ohio R. Co.,* 200 F.Supp. 368, 370 (N.D.W.Va.1962), where the court conjecturally remarked by obiter dictum: "Certainly, there must be many services performed by others under contract with a railroad, which are . . . necessary to the corporate purposes of the railroad, which are not 'operational activities' within the meaning of those words as employed in the *Sinkler* case. Just where the line should be drawn, I am neither prepared nor called upon to specify."

In this court's view an additional important consideration bearing upon whether or not the "operational activity" doctrine of *Sinkler* should be invoked so as to constitute a railroad's contractor the constructive agent of the railroad for FELA purposes should be the factual one of whether the activity carried on by the railroad's contractor is prosecuted upon the railroad's premises then in use by it for the purpose of carrying out its franchise, with the consequent exposure of the railroad's employees then on those premises to the risks of the negligent prosecution thereof by that contractor, or conversely, is prosecuted by such contractor elsewhere with no such exposure.

As a practical matter almost if not all activities performed by a railroad are prosecuted for the purpose of carrying out its franchise, but not all of them are required, in the sense that they are absolutely essential, to be performed for the accomplishment of that purpose.[3] They are usually performed by the railroad's employees upon railroad premises, but they may be performed thereon by others.

If the term, "operational activity" in the *Sinkler* context is to be so narrowly defined as to include only activities absolutely and essentially required to carry out a railroad's franchise, such as carrying freight and passengers, laying track, maintaining equipment and ways and the like, and activities required incidental to the accomplishment of those operations, as well as those activities which a railroad has a lawful duty to perform,[4] but to exclude all activities which are not absolutely and essentially required for a railroad to perform for the purpose of carrying out its franchise, but which it may lawfully elect to perform upon premises held and in use by it in the promotion of its best interests and its franchise and in the "furtherance of its operational activities," then the broad purpose of FELA, as recited in *Sinkler*, would be thwarted, rather than promoted, in that a railroad could then freely engage an independent contractor to come upon such premise to perform such activities so·excluded from that definition and thereby successfully escape the obligations and liabilities intended to be imposed upon the railroad by FELA.

An analogy—in this court's view neither a strained nor far-fetched one—may be struck in relation to the facts in *Sinkler* and those in the case at bar, and that is to say:

In *Sinkler*, the specific operational activity involved was the switching by Belt Railway, acting under contract with the respondent railroad, of a private car furnished by the respondent railroad for the use, convenience and benefit of that railroad and its general manager, on tracks in use by that railroad. Certainly, it cannot be said that the furnishing thereof was required, a *sine qua non*, for the purpose of the railroad's carrying out of its franchise or performing

---

3. For example, the C&O could effectively carry out its franchise without having the "Chessie" kitten emblem appear on most if not all of its rolling stock and stationary facilities, but can it seriously be asserted that one of its employees who performs the activity of affixing that emblem in or on a building held and being used by the C&O to carry out its franchise is not, in so doing, performing an operational activity, or that if the C&O engaged, under contract, an independent contractor so to do, and as a result of that contractor's doing so one of C&O's employees then on the premises of that building sustains injury, then C&O could escape the imputation of that contractor's negligence to C&O on the ground that the contractor was not engaged in an "operational activity" for C&O, because such affixing of that emblem was not "required to carry out the franchise" of C&O? This court is not convinced that the court in

*Sinkler* intended the "operational activity" doctrine so narrowly to operate. While the affixing of the emblem to the building is not required, that is to say, is not absolutely essential, to C&O's carrying out its franchise, since affixing "C&O," or other appropriate marking to C&O's rolling stock and stationary facilities would minimally suffice to identify them, that kittenish emblem is a form of advertising calculated to appeal to the public psyche, even excluding that of the ailurophiles among us, to better promote C&O's business interests and thus, now quoting *Sinkler*, to "further the operational activities" of C&O.

4. Such as the statutory requirement that incapacitated seamen be brought before a U. S. Consul before discharge from a ship in a foreign port, as in *Hopson v. Texaco, Inc.,* 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966),

its operational activities;[5] and if the furnishing thereof was not so required, then *a priori*, the switching of the same was likewise not required, for that purpose. Doubtless, however, the furnishing and switching thereof afforded the general manager greater comfort, happiness and convenience and thereby enabled him and the respondent railroad more efficiently *to carry out the franchise and further the operational activities of the railroad*, else it would not have been furnished.

In the case at bar, the specific activity involved was the operation by Rollyson, under contract with the C&O, of the cafeteria, on premises held and in use by C&O in its operation of its railroad and the carrying out of its franchise, for the use, convenience, and benefit of C&O and its employees. And here again certainly it cannot be said that the operation thereof was required, a *sine qua non*, for the carrying out by C&O of its franchise or the performing of its operational activities, yet the operation thereof doubtless afforded C&O's employees greater happiness, comfort and convenience and thereby enabled them and the C&O more efficiently to carry out C&O's franchise and to further its operational activities, else it would not have been operated?[6]

It is perfectly legitimate for a railroad company to provide its employees with eating facilities. 65 Am.Jur.2d, Railroads, § 21, reads in part:

> The erection and maintenance, by railroad companies, of hotels and eating stations along their roads for the use and accommodation of their employees and passengers are legitimate railroad purposes when such hotels or stations are reasonably necessary for the convenience of such persons, but they are ultra vires in other cases.

■ For the foregoing reasons, this court holds that in the operation of the cafeteria,

under contract with the C&O, Rollyson was performing an operational activity of C&O, and such being true, then regardless of whether Rollyson was an independent contractor or an agent of C&O in so doing, the negligence of Rollyson resulting in plaintiff's injuries was imputable to C&O.

*Now addressing the second issue above posed*: Restatement, Agency 2d, § 220(2), sets forth various traditional tests by which one acting for another is determined to be a servant (agent) or an independent contractor, and that section reads:

§ 220. Definition of Servant

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

wherein the Jones Act and FELA were applicable.

**5.** It cannot be seriously asserted that other arrangements short of furnishing that private car would not minimally have sufficed.

**6.** Plaintiff testified that the cafeteria was convenient to C&O's employees, particularly in inclement weather. A C&O official testified to the effect that the happier and more contented a given employee was the better that employee performed and served C&O.

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

In the following discussion of this second issue, the above-quoted subsections of § 220(2) will be referred to as "(a)," etc., and comments appearing under that § 220 will be referred to as "Comment a.," etc.

Comment g. reads in part as follows: Under the usual Employers' Liability Acts . . . the tests given in this Section for the existence of the relation of master and servant are valid.

See *Smith v. Norfolk and Western Ry. Co., supra,* at 503, where Restatement, Agency 2d § 220, is cited as applicable authority.

### (a)

From the very outset the terms of the Agreement gave C&O almost complete control over the details of Rollyson's performance of the work of operating the cafeteria in almost every conceivable area thereof.[7] Indeed, the most creative-minded restaurat-

eur would likely be sorely pressed to ideate other areas of activity not thereby specified and controlled in detail. About the only area in which Rollyson was allowed any discretion thereby was in the selection, preparation and service of the food which the Agreement specified in detail would be served. The Agreement in essence practically reduced Rollyson's role to that of a cook and food server.

Comment d. reads in part:

Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking.

■ It is the right of a railroad to control the contractor, rather than the exercise of that right to control, that determines whether a contractor is an independent contractor or an agent of a railroad. *Pennsylvania R. Co. v. Barlion,* 172 F.2d 710 (6th Cir. 1949).

By the test in (a), the court concludes that Rollyson clearly would be C&O's agent under the terms of the Agreement.

### (b)

The performance by Rollyson of its obligations under the Agreement were distinct

---

7. The Agreement provided, in part and substance, that C&O was "willing to permit" food, beverages, etc., to be sold and dispensed in the cafeteria area of C&O's office building, and that Rollyson "desired" to do so, upon the terms and conditions set forth therein, and further provided: that Rollyson may enter said Facilities at all reasonable times in the performance of its obligations thereunder, would maintain records of income and expenditures and make the same available to C&O for examination and audit, but would retain all profits and pay all costs incident to the food service operation and in return would provide the services outlined in the agreement at no cost to C&O; that the decor of the cafeteria would be as mutually agreed upon; that meal service period for the cafeteria hot line would be from 11:15 a.m. to 1:30 p.m. for lunch Monday through Friday, beverage service would be available 7:00 a.m. to 4:00 p.m. on those days, complete hot and cold food service would be provided during the lunch period, and beverage, snack and tobacco vending service provided at all times; that use of the facilities would be limited to employees of C&O and their invited guests and that Rollyson would not use the facilities for any different purpose absent sub-

sequent agreement of the parties, and that Rollyson would provide food and service for special breakfasts, luncheons and dinners at any time C&O requested the service upon 48 hours advance notice, the cost to be mutually agreed upon; that all food would be of good quality and served, packaged or wrapped in suitable sanitary containers and the cafeteria would include daily a salad, entree, hot and cold sandwich selections, and soup, dessert items, ice cream desserts, coffee, milk, iced tea and carbonated iced beverages; that Rollyson would employ, train and provide a uniformed attendant to service and maintain the equipment and food service area and to bus and clean tables and assist C&O employees during the hot meal period, would provide complete janitorial service for the cafeteria, maintain a container for waste paper at a place designated by C&O and remove the waste daily, and that minimum janitorial service would include daily the wiping of dining room tables and chairs, sweeping of the dining room floor, spot-mopping of spills thereon and damp-mopping the kitchen, twice weekly damp-mopping the dining room floor and semi-annually stripping and waxing its floor.

from other activities in which C&O was engaged. However, as pointed out above, it is perfectly legitimate for a railroad to operate an eating establishment for the convenience of its employees. Thus the distinct occupation factor is for all practical purposes nullified.

The court concludes that this (b) test does not militate against Rollyson's being held to be C&O's agent.

#### (c)

Cafeteria operations are usually performed by a specialist without supervision. As pointed out above, the detailed control exercised by C&O over Rollyson under the terms of the Agreement practically reduced Rollyson's role to that of a cook and food server. See the excerpt from Comment d. above quoted.

The court concludes that this (c) test weighs in favor of Rollyson's agency.

#### (d)

Comment i. reads in part:

Even where skill is required, if the occupation is one which ordinarily is considered as a function or an *incident to the business establishment of the employer*, there is an inference that the actor is a servant. (emphasis added)

The court's conclusions pertaining to the (c) test next above is equally as valid and applicable to the "skill" element in this (d) test, which conclusion is reinforced by the application of the excerpt from Comment i. quoted next above in the light of the fact that C&O could legitimately operate an eating establishment for the benefit of its employees.

#### (e)

Comments k. and l. respectively provide:

k. *Ownership of instrumentalities.* The ownership of the instrumentalities and tools used in the work is of importance. The fact that a worker supplies

his own tools is some evidence that he is not a servant. On the other hand, if the worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use, and this indicates that the owner is a master. This fact is, however, only of evidential value.

l. *Control of the premises.* If the work is done upon the premises of the employer with his machinery by workmen who agree to obey general rules for the regulation of the conduct of employees, the inference is strong that such workmen are the servants of the owner, and this inference is not necessarily rebutted by the fact that the workmen are paid by the amount of work performed or by the fact that they supply in part their own tools or even their assistants. If, however, the rules are made only for the general policing of the premises, as where a number of separate groups of workmen are employed in erecting a building, mere conformity to such regulations does not indicate that the workmen are servants of the person making the rules.

The court concludes that since each of C&O and Rollyson provided a part of the tools and instrumentalities for the cafeteria, and C&O provided the cafeteria itself, the working place,[8] this test (e) weighs more heavily in favor of Rollyson's agency than its status as an independent contractor.

#### (f)

The Agreement provided no fixed term for the relationship between the parties to endure; either had the right to terminate it upon giving 60 days written notice to the other.

---

**8.** Under the terms of the Agreement, C&O supplied the place of work, i.e., the cafeteria area of C&O's office building, and at its expense furnished all utilities, all heating and air conditioning, ceiling and floor covering, wall paneling, drinking fountains and general lighting, and extermination service for rodents and vermin, and Rollyson, at its expense, furnished and/or installed kitchen equipment, vending machines, condiment counters, change machines, storage facilities for use in selling and dispensing food (and Rollyson retained title thereto and the right to remove the same from the premises upon termination of the Agreement) and all janitorial service. The decor was to be mutually agreed upon.

Comment j. provides:

j. *Period of employment and method of payment.* The time of employment and the method of payment are important. If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made by the job and not by the hour. If, however, the work is not skilled, or if the employer supplies the instrumentalities, the workman may be found to be a servant.

It is fair to conclude from the nature of the arrangement that the parties intended for it to endure a considerable period, which the court concludes weighs more heavily toward agency than independent contractor status.

### (g)

The payment or consideration moving to Rollyson was its retention of the profits from the operation of the cafeteria. See Comment j. quoted above. The court concludes that this test would preponderate slightly in favor of Rollyson's being an independent contractor rather than an agent.

### (h)

The operation of the cafeteria was not the chief business of C&O, but again it could legitimately operate the cafeteria for the convenience of itself and its employees, and in that sense its operation was a part of C&O's regular business.

The court concludes that this (h) test does not preponderate in favor of independent contractor status of Rollyson.

### (i)

The parties did not believe they were creating an agency relationship between them; indeed, the Agreement expressly provides that Rollyson ". . . shall always be an independent contractor and neither it nor its employees shall be deemed to be agents or servants of . . ." C&O.

Comment m. provides:

m. *Belief as to existence of relation.* It is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other. However, community custom in thinking that a kind of service, such as household service, is rendered by servants, is of importance.

■ A provision in an agreement that one is to perform work for a carrier as an independent contractor is not conclusive; the spirit and purpose of an agreement as well as its letter, must be considered in the interpretation and application of a contract, and what a contract is styled by the parties does not determine its character or their legal relationship. *Cimorelli v. New York Cent. R. Co.*, 148 F.2d 575 (6th Cir. 1945).

The court concludes that though the parties' beliefs as to their relationship, and the designation in the Agreement of Rollyson as an independent contractor and not an agent, must be taken into account, it is not controlling in the light of the fact that other factors so strongly inveigh against Rollyson's having an independent contractor, as distinct from an agency, status.

### (j)

C&O is, of course, in business. See the excerpt from Comment i. quoted above. The court concludes this test (j) weighs in favor of agency on Rollyson's part.

■ Deciding the second issue above posed under the traditional agency tests above discussed, the court holds Rollyson to have been the agent of C&O under the terms of the Agreement, wherefore Rollyson's negligence was imputable to C&O even if the operation by Rollyson of the cafeteria was not an "operational activity" under the *Sinkler* doctrine.

*Now addressing various other grounds and points of error set forth in the motions* :

Movants assert that the Agreement created a lease between Rollyson and C&O, requiring application of rules of law other than those applied by the court.

■ This assertion is untenable. The Agreement is more in the nature of a license than that of a lease. It has almost

none of the hallmarks of a lease. It provides for no rental to be paid by Rollyson, nor for any fixed term during which Rollyson will "hold." It does not use the words usually employed to create a leasehold estate, such as "lease," "demise," etc., nor any other words which do so, but rather recites that C&O is willing to "permit" food, etc., to be sold, etc., by Rollyson, who desires to do so, in the cafeteria area. At no time does it nominate or imply Rollyson to be a lessee; rather it provides that Rollyson would be an "independent contractor," thus evincing an intent on the part of the parties to create a relationship other than a landlord-tenant one. Moreover, C&O's detailed control over Rollyson's activities in, and its use of, the cafeteria under the Agreement's terms is inconsistent with Rollyson's having acquired a leasehold estate in the cafeteria. See 25 Am.Jur.2d, Easements and Licenses, § 123; 49 Am.Jur.2d, Landlord and Tenant, § 5.

Both Rollyson and C&O assert that the court erred in instructing the jury that: "The extent of the duty of C&O, as an employer, was to exercise ordinary care to see that the place in which work was to be performed [by plaintiff] was reasonably safe, under the circumstances shown by the evidence in this case. In this case, the cafeteria is a 'place to work,' within this instruction and must have been maintained as reasonably safe by C&O." Both contend the cafeteria was not a "place of work" in the context of FELA under the facts, and Rollyson cites *Metropolitan Coal Co. v. Johnson*, 265 F.2d 173 (1st Cir. 1959) and *Getty v. Boston & Maine Corp.*, 505 F.2d 1226 (1st Cir. 1974) in support of the contention that plaintiff was not covered by FELA at the time of her injury since she was not then engaged in the course of her employment.

In *Johnson*, the defendant employer had issued the plaintiff employee a pass which permitted him to ride as a passenger on defendant's passenger trains for all lawful purposes, and plaintiff was injured while using the pass to ride defendant's passenger train some miles distant to his place of work for the purpose of commencing his work there. In *Getty*, a like pass had been issued, and the plaintiff employee was injured while walking from his parked automobile toward defendant employer's passenger train for the purpose of boarding and using the pass to ride it some miles distant to his place of work to commence his work there. In neither was the plaintiff required by his defendant to use the passenger train involved as a means of transportation to his place of work, though each was permitted to do so, and at the time of injury neither plaintiff was being paid by his defendant employer.

In certain particulars the facts in each of *Johnson* and *Getty* parallel those in the case at bar, in that in each of them the plaintiff was not required by the defendant to use its passenger train for the purpose of travelling to his place of work, as plaintiff here was not required to use the cafeteria in which to have her lunch, and in each of them, as here, the plaintiff was not earning wages at the precise time of the injury.

Far more compellingly controlling, in this court's view, are the factual differences. In each of *Johnson* and *Getty*, at the time of his injury the plaintiff was miles from and had not reached the premises of his place of work, much less reported for and commenced his work thereat, whereas here the plaintiff was at her place of work, had been working at her work thereat on C&O's premises and, incident to her work thereat, went to another part of those premises to have her lunch.

In *Virginian Ry. Co. v. Early*, 130 F.2d 548 (4th Cir. 1942), plaintiff, after leaving a lunchroom on the defendant railroad's premises and while walking on its premises to his place of work before commencing his work thereat, was felled and injured by a blast of steam negligently loosed by a fellow employee. The court said that a temporary stoppage of work for purposes which are necessarily incident to the life of an employee does not put an end to the relationship of employer and employee, since such an occurrence must have been within the contemplation of the parties, that such rule had been applied to such ordinary circumstances as resting temporarily, procur-

ing drinking water, eating lunch on the premises, etc., and that plaintiff's visit to the lunchroom before going to work was as clearly incidental to his employment as a visit during his lunch hour would have been. In *Baltimore & O. R. Co. v. Kast*, 299 F. 419 (6th Cir. 1924), the court held that a railroad employee, engaged in a work in interstate commerce, who had stopped work and was going after his lunch on the premises when injured, with the intention of returning immediately afterward to the same work, was employed in "interstate commerce" at the time of injury, within FELA.

■ Here, C&O virtually, if not in fact, invited its employees to patronize the cafeteria during their lunch hour, and their doing so incident to their employment was certainly contemplated by C&O. Thus, the cafeteria was a "place to work" under the facts in the case at bar and in the context of the instruction given, and that instruction correctly stated the law applicable to those facts.

Further assertions, in substance, are that C&O had no duty to inspect the cafeteria, that plaintiff failed to present evidence from which the jury could infer that C&O was negligent in inspecting the same or that Rollyson knew, or had reasonable opportunity to know, the "pat" of butter was on the cafeteria floor, rendering it unsafe, or that either Rollyson or C&O had any actual or constructive knowledge that an unsafe condition existed or that plaintiff was in any danger.

■ These grounds are not well taken. The evidence showed that from some time prior to the plaintiff's stepping on the "pat" of butter, Rollyson's cashier had been at her post and had a view of the area where the "pat" of butter must have lain before and when plaintiff stepped thereon; that plaintiff was carrying her tray in front of her when she did so; and that some of C&O's employees preceded plaintiff through the cafeteria line; but there was no evidence to show that on the day plaintiff was injured, any persons except C&O employees had patronized the cafeteria prior to plaintiff's being there.

Upon this and related evidence the issues of whether C&O was negligent and whether plaintiff was contributorily negligent were questions for the jury to resolve, and it did so under proper instructions from the court. *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). The court did not instruct the jury that C&O had a duty to inspect the cafeteria; rather, the court instructed the jury that if it believed from a preponderance of the evidence ". . . that the C&O, acting through Rollyson's neither knew, nor in the exercise of reasonable care should have discovered, that the 'pat' of butter was on the floor of the cafeteria, . . . then and in that event you should find the plaintiff may not recover from the C&O."

In this same vein, C&O contends the court erred in refusing to give C&O's proffered instruction reciting that under FELA, ". . . the *presumption* prevails, even after proof of an unsafe or defective condition, that the railroad company was not aware of its existence, and until it is shown that the railroad company knew, or in the exercise of ordinary care should have known, of the unsafe condition, if there was any, it cannot be charged with knowledge thereof" (emphasis added), C&O having cited as authority for the giving thereof the cases of *Wetherbee v. Elgin, Joliet & Eastern Ry. Co.*, 191 F.2d 302 (7th Cir. 1951); *Kaminski v. Chicago River &. Ind. R. Co.*, 200 F.2d 1 (7th Cir. 1952); *Van Horn v. Southern Pac. R. Co.*, 141 Cal.App.2d 528, 297 P.2d 479 (1956); *Hawkins v. Clinchfield R. Co.*, 37 Tenn.App. 529, 266 S.W.2d 840 (1953); and *St. Louis, Iron Mountain, & Southern Ry. v. Ingram*, 124 Ark. 298, 187 S.W. 252, aff'd, 244 U.S. 647, 37 S.Ct. 741, 61 L.Ed. 1370 (1916).

This court carefully read the *Wetherbee* and *Kaminski* decisions. Each of them constitutes authority for the instruction given by this court on the point in the case at bar, neither constitutes authority for giving the instruction proffered by C&O, and neither even so much as mentions the word "presumption" nor any of its forms. The proffered "presumption" instruction misstates the law applicable to this case. *Urie v.*

*Thompson, supra*, 337 U.S. at 178, 69 S.Ct. at 1028.

C&O further contends the evidence was insufficient to present to the jury the question of whether an employee of C&O dropped the butter on the floor of the cafeteria or was in any way negligent in so doing or was otherwise negligent.

■■■ As pointed out above, the evidence showed that C&O employees preceded plaintiff through the cafeteria line, some of them immediately before she was injured, and strongly tended to show that no persons except C&O employees had patronized the cafeteria on the day plaintiff was injured prior to her sustaining injury there. Such strong circumstantial evidence was sufficient to let the question of negligence of other C&O employees go to the jury for resolution. In FELA cases, "[t]he burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957) (footnote omitted).

C&O also asserts that plaintiff failed to offer any evidence supporting her claims that C&O was negligent in making and enforcing proper rules as to the manner of operating and cleaning of the cafeteria, and making and publishing sufficient rules, regulations and procedures for employees of C&O and Rollyson.

The Agreement itself prescribed detailed rules regulating the operation and cleaning of the cafeteria, which would, of course, apply to regulate Rollyson's employees' activities. None were issued regulating C&O's employees in their use of the cafeteria so far as was shown by the evidence.

■■■ The issues of whether C&O exercised ordinary care in the making of such rules as were made, and in failing to make any that such care would have required it to have made, was a jury question. 32 Am.Jur.2d, Federal Employers' Liability, etc., § 28; *Pritt v. West Virginia Northern R. Co.*, 132 W.Va. 184, 51 S.E.2d 105, 6

A.L.R.2d 562, *cert. den.* 336 U.S. 961, 69 S.Ct. 891, 93 L.Ed. 1113.

■■■ Rollyson claims error as to the court's instruction that if the jury found by a preponderance or greater weight of the evidence that either C&O or Rollyson was negligent and that such negligence proximately caused, in whole or in part, or in any way contributed no matter how small or in the slightest degree to, the accident and plaintiff's injuries, then the verdict should be for plaintiff and against C&O.

Such instruction accurately states the law. 45 U.S.C. § 51; *Rogers v. Missouri Pacific R. Co., supra*, 352 U.S. at 506, 77 S.Ct. at 448; *Funseth v. Great Northern Ry. Co.*, 399 F.2d 918 (9th Cir. 1968); *Hausrath v. New York Central R. Co.*, 401 F.2d 634 (6th Cir. 1968).

Both Rollyson and C&O claim as error the court's charging the jury that if it found plaintiff was entitled to a verdict, then in arriving at the amount of the award, the jury should include such sums as would reasonably compensate her for loss of any future earning power, caused by the injury in question, which the jury found from the evidence plaintiff was reasonably certain to suffer in the future, C&O contending that no evidence had been presented to show that plaintiff was reasonably certain to suffer any loss of earning in the future.

■■■ In the same vein, error is also predicated upon the court's permitting plaintiff's economist, Dr. Joseph LaCascia, to testify, and refusing to strike his testimony, as to plaintiff's future earning capacity, he having testified, in substance, that based upon standard reliable data and standard economic theory, the value at the time of trial of the future earning capacity of the plaintiff, given her age, working-life expectancy and wages being earned, including fringe benefits but excluding income taxes, would amount to the sum of $457,396. Both C&O and Rollyson claim, in substance, that no evidence was presented that plaintiff would, to a reasonable degree of certainty, sustain future damages or would be

without employment with C&O, since plaintiff had returned to work at C&O some months prior to the trial as a secretary, a job involving lighter manual duties than that at which she was working when injured. Thus, they insist, she could not have sustained diminishment of her future earning capacity.

Curwood R. Hunter, M.D., a neurological surgeon, testified in substance and by depositions that plaintiff's injuries were diagnosed as a herniated intervertebral disc between the fourth and fifth lumbar vertebrae, which was surgically removed on August 17, 1977, and another such herniated disc between the fifth and sixth cervical vertebrae; that it was his opinion with reasonable medical certainty that the permanency of plaintiff's injuries resulting from the accident amounted, from a functional standpoint, to a disability of 20 to 25 percent to her body as a whole, one-half of which was attributable to her cervical area and the other one-half to her low back; that she could not, on a regularly sustained, eight-hour-day, five-day-a-week basis, engage in the duties required by the job at which she was working when injured; that though she might be able to get a job, she could not compete in the job market; that her back would never return to the state it was in prior to the injury, though this opinion was not expressly stated to be with reasonable medical certainty; that she would continue to improve but would not totally recover; that though she was released to return to work on July 9, 1979, as a typist, at which position she remained employed by C&O at trial, there would be limitations to the things she could do, including heavy, manual-type occupation, lifting over 25 pounds, bending on a continuing basis, working in cramped quarters and such.

■ It is true that no testimony expressed, literally and by way of a conclusory opinion, with reasonable medical certainty that plaintiff's potential future earning power would be diminished as a result of her injuries, nevertheless Dr. Hunter's testimony constituted adequate basis for the giving of the instruction last above mentioned and for permitting and not striking the testimony of the economist LaCascia, since the jury could fairly infer from Dr. Hunter's testimony that plaintiff's future earning power would be diminished, and on the evidence decide the extent of diminishment thereof. "The principle is established that when the evidence in a case shows that there will be future effects from an injury, an instruction which justifies an inclusion of them in an award of damages is not error." *Chesapeake & Ohio Ry. Co. v. Carnahan*, 241 U.S. 241, 244, 36 S.Ct. 594, 595, 60 L.Ed. 979 (1916).

■ Also assigned as error was the court's permitting plaintiff to testify, and refusing to strike her testimony, concerning an experiment conducted by her about two months before the trial wherein she purchased some "pats" of butter in the cafeteria involved, placed them on a table there, rather than on the floor, and noted and testified to the period of time involved in their melting to the consistency of the "pat" of butter she testified she stepped on in the cafeteria at the time of her injury.

This testimony was properly admitted. 29 Am.Jur.2d, Evidence, § 820, reads in part: "It is a matter peculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances."

■ To render experiments permissible, or admit evidence of experiments made out of court, the conditions need not be identical with those existing at the time of the occurrence, and it is sufficient if there is a substantial similarity. Annot., 85 A.L.R. 480 (1933). The measure of the permissible extent of variations of the conditions of the experiment from those of the occurrence is whether such variations are liable to confuse or mislead the jury. Annot., 85 A.L.R. 482 (1933), and if the essential condition under which the experiment or observation is made are substantially the same as those of the actual occurrence in issue, any departure or minor variation goes to the weight rather than the admissibility of the evidence, Annot., 85 A.L.R. 483 (1933).

■ C&O also assigns as error the court's refusal to submit to the jury its

requested charge that the provision of FELA making a railway company liable for negligence " . . . does not mean that the railroad employer is responsible for injury of an employee merely because it was caused by some defect or insufficiency . . ."

The court is not lawfully required, quite absurdly and nonsensically, negatively to instruct the jury *ad infinitum* as to what that provision of FELA "does not mean," to use the language of the requested charge.

The Court does have the duty to instruct the jury positively as to what that provision of FELA *does mean*, and this the court did by instructing the jury that: "If there is an injury as the result of some defect or insufficiency, but if that defect or insufficiency was not due to the negligence of the railroad company or any other party to which the railroad company has delegated its duties under that Act, then the defendant railroad cannot be held responsible."

The charge given by the court merely stated the obverse of the negatively couched charge requested, and that requested charge was thus, in effect, given by the court.

C&O and Rollyson assert that the verdict was grossly excessive and unreasonable under the evidence.

■ In addition to the testimony of Dr. Hunter and economist LaCascia, above recited in part, the evidence as to damages also showed that plaintiff was 38 years old at the time of trial; that her pain was rather intense and constant from her January 19, 1977 injury to about two years subsequent thereto, when it began gradually to subside; that she was hospitalized for seventeen days in connection with her operation for the herniated lumbar disc on August 17, 1977; that her ability to perform her housework was, and at trial still remained, substantially diminished; that she lost wages of $80.85 per working day for the period from her injury until she was returned to work in November, 1979; that at trial she still suffered pain when she

became overtired, but her pain had almost completely subsided otherwise; that she had undergone a tubal ligation, Dr. Edwin J. Humphrey, an obstetrician and gynecologist, having testified that because of her lower lumbar surgery, he had advised her not to become pregnant again and had sterilized her in June, 1978; and that plaintiff married for the second time about four years prior to trial.

The only evidence presented by C&O or Rollyson mildly contradictive of plaintiff's evidence as to damages was the testimony of a Dr. Smith, an orthopedic surgeon, to the effect that as of the date of trial plaintiff had not attained complete improvement; that since she did have some "residual" findings, it was his impression that she could not return to a heavy-duty job involving her lifting more than 25 to 30 pounds; that her condition would further improve after which such weight restrictions could be removed; and, contrarily, that she could work her normal life expectancy provided she not be required to lift in excess of 25 to 30 pounds.

Based upon all of that evidence, and applying thereto the tests in *West v. Richmond, F. & P. R. Co.*, 528 F.2d 290 (4th Cir. 1975), the verdict was consonant with, and not against, the clear weight of that evidence. The verdict was not untoward, inordinate, outrageous, unreasonable, shocking to the conscious nor the product of a runaway jury, nor would it result in a miscarriage of justice. It cannot be said that it was the product of a jury actuated by passion or other improper or unlawful influence. While the amount of the verdict is some more generous than this court would have awarded had it been the factfinder, in the court's view that evidence would have supported an even greater verdict which could have survived C&O's and Rollyson's assault. The verdict was not excessive in the light of the evidence, and the court so holds.

The remaining grounds and errors assigned in the motions either present assertions of prejudicial error meriting no discussion [9] or are based upon the court's having

9. For example, the court is genuinely puzzled by C&O's assertion that the court erred by

refusing to give C&O's instruction that in order to hold it responsible, the jury must have been

charged the jury consistent, or having refused to charge it inconsistent, with the rulings appearing above.

### Motion of C&O for Judgment against Rollyson

Here C&O moves, pursuant to its third-party complaint against Rollyson, and based upon the indemnity and related provisions contained in paragraphs 16 and 17 of the Agreement [10] and upon the answers returned by the jury to questions propounded to it by the court,[11] that judgment be entered in favor of C&O and against Rollyson for the amount of the $150,000 verdict recovered against C&O by plaintiff herein, plus the reasonable and necessary attorney fees and expenses incurred by C&O in the defense of this action. This motion is sustained.

convinced that plaintiff's injury was "occasioned" by the negligence of C&O or Rollyson by a preponderance of the evidence, in light of the fact that the court properly and lawfully charged the jury in these connections.

**10.** Paragraphs 16 and 17 of the Agreement in material part respectively read as follows:

16. Vendor [Rollyson] shall and hereby does protect, defend, indemnify and save harmless Chesapeake Company [C&O] from and against any and all liability, claims, damages, costs and expenses of whatsoever character that may be claimed or asserted against Chesapeake Company by any person, firm or corporation whatsoever on account of any actual or alleged illness, injury, or death occurring to any person whomsoever (whether or not an employee of Vendor or of Chesapeake Company) or on account of any actual or alleged loss of or damage to property (regardless of ownership, whether caused either in whole or in party [sic] by, arising out of, resulting in any manner from, or connected in any manner whatsoever with an act or omission of Vendor, its officers, agents or employees . . . or arising out of the dispensing or consumption by any person of food, beverages or tobacco products or the handling or opening of bottles, cans or other containers in said Facilities . . .

17. Chesapeake Company [C&O] shall promptly notify Vendor [Rollyson] in writing of any claim made or suit filed against Chesapeake Company arising out of or incident to the operations contemplated by this agreement, by United States Registered Mail addressed to:

C&O contends that, under the provisions of paragraph 16 of the Agreement, Rollyson is contractually obligated to indemnify C&O in the amount of said verdict since the jury affirmatively answered question 3, and thereby found that plaintiff's accident and damages arose "out of the dispensing or consumption of food in the cafeteria" operated by Rollyson, within the language of that paragraph. C&O further contends that C&O gave Rollyson notice of the institution of plaintiff's action against C&O herein and tendered to Rollyson the defense thereof, all of which Rollyson has admitted in its answer to the third-party complaint; that the provisions of paragraph 17 of the Agreement contractually obligated Rollyson thereupon to assume and undertake the defense thereof on C&O's behalf, which Rollyson refused to do, necessitating C&O's doing so; and that C&O is thus also entitled

Rollyson's Catering Service, Inc.
6067 Ohio River Road
Huntington, West Virginia 25702
Any such claim or suit shall be defended or settled by and at the expense of Vendor. Chesapeake Company shall, without cost or expense to itself, assist Vendor in its investigation of any such claim made or suit filed.

**11.** The jury answered affirmatively the following questions propounded to it by the Court:

1. Totally independent of any negligence of which Rollyson, or any of its officers, agents or employees may have been guilty, was C&O, or any of its officers, agents or employees guilty of any negligence which proximately caused, or contributed in any degree to, the accident and injuries about which the plaintiff now complains?

2. Totally independent of any negligence of which C&O, or any of its officers, agents or employees may have been guilty, was Rollyson, or any of its officers, agents or employees guilty of any negligence which proximately caused or contributed in any degree to the accident and injuries about which the plaintiff now complains?

3. Did the accident and resulting damages about which plaintiff now complains arise out of the dispensing or consumption of food in the cafeteria operated by Rollyson?

4. Was the plaintiff guilty of any negligence which proximately caused or contributed to the accident or injuries about which she complains? (If your answer to this Question 4. is "yes," then you will reduce Plaintiff's damages as instructed by the court.)

to judgment against Rollyson for C&O's reasonable and necessary attorney fees and expenses incurred in doing so.

Opposing C&O's motion, Rollyson contends that, under the evidence and instructions of the court herein, the jury's affirmative answer to question 1—thereby finding C&O to have been guilty of negligence which, independently of that of Rollyson, caused or contributed to plaintiff's injuries—could have been based upon the jury's finding that C&O had been guilty of either the act of omission in failing to use reasonable care to make, prescribe and publish to its and Rollyson's employees proper rules, procedures and practices to follow in the use and operation of the cafeteria, or the act of commission consisting of one of C&O's employees' negligently dropping upon the cafeteria floor the "pat" of butter upon which plaintiff slipped causing her injuries; that any such act of omission on C&O's part was totally outside the contemplation of the Agreement and the indemnity provisions thereof, and if the jury based such finding upon that act of omission, as distinct from that act of commission, then Rollyson would have no contractual duty under the provisions of the Agreement to indemnify C&O herein; and that since it is conjectural as to whether it was that act of omission or that act of commission upon which that jury finding was based, Rollyson cannot be held contractually liable to indemnify C&O under the provisions of the Agreement.

 A contract's language must be accorded its plain meaning and, where plain, the language must be given full effect. *Nisbet v. Watson*, 251 S.E.2d 774, 780 (W.Va.1979). Where the parties lawfully contract, and their contract is free from ambiguity or doubt, their agreement furnishes the law which governs them. *Magnus v. Halltown Paper Board Co.*, 143 W.Va. 122, 100 S.E.2d 201, 204 (1957). The rules generally governing the requisites and validity of contracts apply to contracts of indemnity and the language of such a contract must clearly and definitely show an intention to indemnify against a certain loss or liability; otherwise it is not a contract of indemnity. In construing a contract of in-

demnity and determining the rights and liabilities of the parties thereunder the primary purpose is to ascertain and give effect to the intention of the parties. *Sellers v. Owens-Illinois Glass Co.*, 156 W.Va. 87, 191 S.E.2d 166, 169 (1972).

 Whether C&O's motion ought to be sustained or overruled does not hinge, as Rollyson asserts, upon whether the jury's affirmative answer to question 1 was based upon the jury's finding that C&O was negligent by having been guilty of that act of omission or that act of commission. Indeed, that answer may have been based upon the jury's having found C&O to have been guilty of either the act of omission or the act of commission or both of them, and regardless of whether it was the one, the other or the both of them upon which the jury based that answer, Rollyson would nevertheless still be contractually obligated to indemnify C&O under the clear meaning of the language of paragraph 16, because of the jury's findings reflected in its answers to questions 2 and 3.

Clearly the provisions of paragraph 16 of the Agreement obligated Rollyson contractually to "indemnify and save harmless" C&O of and from "all liability, claims, damages, costs and expenses of whatsoever character that may be claimed or asserted" against C&O on account of any "actual or alleged" injury occurring to any person, including "an employee" of C&O, if such injury either was "caused either in whole or in part . . . by an act or omission" of Rollyson or "[arose] out of the dispensing or consumption by any person of food" in the cafeteria.

By answering questions 1 and 2 affirmatively, and thereby finding that each of C&O and Rollyson was guilty of negligence which, independently of the negligence of the other, proximately caused or contributed to the plaintiff's accident and injuries, the jury necessarily found that plaintiff's accident and injuries were proximately *caused in part by an act or omission of Rollyson*, within that language of paragraph 16, and by affirmatively answering question 3, the jury also found that plain-

**1270**

tiff's accident and injuries *arose out of the dispensing or consumption of food in the cafeteria*, within that language of paragraph 16.

The jury having found Rollyson's act or omission, i.e., Rollyson's negligence, to have *caused in part* plaintiff's accident and injuries, then Rollyson became obligated to indemnify C&O under that language of paragraph 16, and such is true notwithstanding that by answering question 1 affirmatively, the jury also found that plaintiff's accident and injuries were in part caused or contributed to by an act or omission, i.e., the negligence, of C&O. Furthermore, by answering question 3 affirmatively, the jury found that plaintiff's accident and injuries *arose out of the dispensing or consumption of food in the cafeteria*, and for that additional reason Rollyson became obligated to indemnify C&O under that language of paragraph 16. Thus, for each and both of such reasons Rollyson is obligated to indemnify C&O in the sum of the $150,000 verdict recovered by plaintiff against C&O herein.

■ Paragraph 17 of the Agreement provided that C&O would promptly notify Rollyson in writing of any claim made or suit filed against C&O arising out of or incident to the operations contemplated by the Agreement, and that any such claim or suit "shall be defended or settled by and at the expense of" Rollyson. Rollyson admits that, pursuant to that paragraph 17, C&O gave Rollyson notice of plaintiff's having filed this action against C&O and therein tendered to Rollyson the defense thereof. Rollyson refused to assume and undertake that defense as it was contractually obligated to do under the provisions of paragraph 17 of the Agreement, necessitating C&O's having to defend the action at its expense; wherefore C&O is also entitled to be reimbursed by Rollyson the reasonable and necessary attorney fees and expenses incurred by C&O in the defense of this action.

Judgment will be entered consistent with this opinion.